United States District Court
Southern District of New York
———————————————————————————

SERGEI CHEPILKO,
                    **Plaintiff,**               08 Civ. 4033 (JGK)

      - against -                <u>MEMORANDUM OPINION</u>
                                                   <u>AND ORDER</u>

CIGNA GROUP INSURANCE,
                    **Defendant.**
———————————————————————————

**JOHN G. KOELTL, District Judge:**

    This case arises from the denial by Cigna Life Insurance
Company of New York ("CLICNY") of a claim for disability
benefits by Dr. Sergei Chepilko ("Chepilko"), the plaintiff <u>pro
se</u>, under a Group Long-Term Disability Insurance Policy (the
"Policy") issued by CLICNY that Chepilko had through his former
employer.  The Policy is subject to the requirements of the
Employee Retirement Income Security Act of 1974 ("ERISA"), 29
U.S.C. § 1001, <u>et seq</u>.  After CLICNY denied Chepilko's claim in
2002, he appealed, and CLICNY denied his appeal.  Chepilko then
brought this breach of contract action pursuant to 29 U.S.C. §
1132(a)(1), seeking to enforce his rights under the Policy.

    CLICNY has now moved for summary judgment pursuant to Rule
56 of the Federal Rules of Civil Procedure, arguing that the
statute of limitations has run, and that, in any event, Chepilko
has failed to raise a material issue of fact, and that the
undisputed facts show that he was able to perform the material

1

duties of his job and was therefore not disabled as defined by the Policy, for a continuous 180-day period, as required by the Policy.  Jurisdiction is proper pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).  For the reasons explained below, the motion for summary judgment is **granted**.

# I.

The standard for granting summary judgment is well established.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  Gallo, 22 F.3d at 1224.  The moving party bears the initial burden of informing the district court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The substantive law governing the case will identify those facts

that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Summary judgment is appropriate if it appears that the nonmoving party cannot prove an element that is essential to the nonmoving party's case and on which it will bear the burden of proof at trial. See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 805-06 (1999); Celotex, 477 U.S. at 322; Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Gallo, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its initial burden of showing a lack of a material issue of fact, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City

of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto
v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998); Montalbano v.
Port Authority of New York and New Jersey, No. 10 Civ. 5973,
2012 WL 516150, at *1 (S.D.N.Y. Feb. 17, 2012).


                              II.

     The following facts are undisputed unless otherwise noted:


                              A.

     Chepilko held a research position at Cornell University's
Weill Medical College ("WMC") since at least 1997. (Arbitrio
Decl., Ex. B ("Administrative Record" or "AR"), at 175.)  In
June, 2001, Chepilko was appointed to a one year position as a
postdoctoral fellow in the Department of Pharmacology at WMC,
which was renewable based on, among other things, performance.
(AR at 173-174.)

     Chepilko was assigned to work on a project relating to the
effect of particular compounds on insulin secretion by the
pancreas. (Def.'s R. 56.1 Stmt. ¶ 3; Pl.'s R. 56.1 Resp. ¶ 3.)
Chepilko was expected to conduct experiments, interpret data,
and prepare manuscripts for publication. (Def.'s R. 56.1 Stmt.
¶ 5; Pl.'s R. 56.1 Resp. ¶ 5.)

     On September 26, 2001, Chepilko, received a termination
letter, effective on September 28, 2001. (AR at 438.)  The

                               4

letter asserted that Chepilko had "failed to make any progress," had "failed in even the most basic laboratory skills," and had "managed to contaminate the cell culture incubator, putting everybody's work at risk." (AR at 438.)

### B.

CLICNY insured Chepilko under the Policy, which was offered through WMC. (Def.'s R. 56.1 Stmt. ¶ 2; Pl.'s R. 56.1 Resp. ¶ 2.) A person covered under the Policy is considered disabled if, "because of Injury or Sickness . . . he is unable to perform all the material duties of his regular occupation." (AR at 39; see Def.'s R. 56.1 Stmt. ¶ 16; Pl.'s R. 56.1 Resp. ¶ 16.)

Under the Policy, an employee only becomes eligible for benefits if the employee is continuously disabled over the course of a waiting period. (See Def.'s R. 56.1 Stmt. ¶ 17; Pl.'s R. 56.1 Resp. ¶ 17.) In Chepilko's case, the parties agree that the waiting period is 180 days, and that the relevant period is September 27, 2001 to March 27, 2002. (See Def.'s R. 56.1 Stmt. ¶¶ 18-19; Pl.'s R. 56.1 Resp. ¶¶ 18-19.)

### C.

The parties dispute the exact origin of Chepilko's alleged disability. Chepilko asserts that he has "suffered from lower back pain for many years," (Pl.'s R. 56.1 Resp. at ¶ 11; see

5

also AR at 168 (MRI from 1995 indicating central disc
protrusion)) and that these problems were "considerably
aggravated" on September 11, 2001, when Chepilko allegedly
walked for over seven hours from Manhattan to Brooklyn.  (Pl.'s
R. 56.1 Resp. at ¶ 11; see also AR at 203, 442.)  Chepilko
claims that, after September 11, 2001, he ceased working full
time, was out of the office for several days, and left early on
days when he was in the office.  (Pl.'s R. 56.1 Resp. at ¶ 14.)

     CLICNY asserts that Chepilko worked full time until
September 27, 2011, and that September 28, his termination date,
was his first day off due to his claimed disability.  (Def.'s R.
56.1 Stmt. ¶¶ 14-15; see also AR at 444.)  In any event, on his
claim form submitted to CLICNY on March 26, 2002, Chepilko
claimed that September 27, 2001 was the day on which he became
totally disabled.  (AR at 0442; but see AR at 331 (form
submitted by Chepilko in April, 2002 indicating that his last
day of work was September 26, not September 27, and that he
worked zero hours, not seven hours, on his last day, and that he
became unable to work on September 12, 2001)).  The portion of
the claim form submitted by WMC also notes that September 27,
2001 was Chepilko's last day working, that he worked for seven
hours that day and that he did not return to work thereafter.
(AR at 0444.)

With respect to Chepilko's medical issues and the medical history of the alleged disability, there is evidence in the record supporting the following facts.

Chepilko first saw Dr. George Fieberg, a chiropractor, on September 14, 2001. Chepilko's subjective complaints included sharp, shooting pain in the neck and lower back, both of which Chepilko complained "preclude[d] carrying out activities of daily living. (AR at 232.) Dr. Fieberg noted the "Date of Onset" as September 11, 2001. (AR at 232.) Dr. Fieberg's objective evaluation confirmed that Chepilko was in "severe pain." (AR at 232.) Dr. Fieberg concluded that "[t]he prognosis for Mr. Chepilko is fair at this time. His is a complicated case and despite the probability of permanent residuals, continued improvement is expected." (AR at 233.) Chepilko continued to see Dr. Fieberg over the course of the next year.

Chepilko visited the New York-Presbyterian Hospital's Emergency Department on September 27, 2001. There is no explicit mention in those records of back or foot problems; rather, the notes indicated that Chepilko was suffering from hypertension and anxiety. (See AR at 169-170.) However, there is evidence that Chepilko complained of pain during that visit,

and he was prescribed Motrin.  (AR at 170.)[1]  Nothing from the notes from Chepilko's September 27, 2001 hospital visit indicates that he was totally disabled.

The next day, September 28, 2001, Chepilko saw Dr. Fieberg again.  Dr. Fieberg noted the same symptoms that he had noted on September 14, 2001, and found Chepilko's condition unchanged and unimproved.  (AR at 234-35.)  With respect to Chepilko's subjective complaints, Dr. Fieberg noted that Chepilko complained that the pain "seriously affected" his daily activities.  (AR at 234.)  Dr. Fieberg described Chepilko as being in a "relief phase of care," and recommended a treatment plan including physical therapy, traction, and electrical muscle stimulation with the goal of decreasing Chepilko's pain and "returning the patient to his pre-clinical status."  (AR at 235.)  Dr. Fieberg gave virtually identical evaluations through five subsequent visits in October, 2001, and four in November, 2001.  (See AR at 236-253.)

Chepilko saw a podiatrist, Dr. Jonathan Thurm, for the first time on November 26, 2001, and Dr. Thurm's notes indicate subsequent visits on November 29, 2001, and on January 17 and March 12, 2002.  (See AR 154-156.)  On November 29, 2001, Dr.

---

[1] Chepilko was also prescribed Lopressor, a blood pressure medication.  (AR at 170); see Metoprolol, U.S. National Library of Medicine - AHFS Consumer Medication Information, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000795/.

Thrum diagnosed Chepilko with a ruptured tendon in his foot and plantar fasciitis, and prescribed a "walking air splint." (AR at 153.) There is no evidence of Dr. Thrum ever opining that Chepilko was totally disabled, or opining as to how long the tendon had been ruptured.

On December, 2001, Dr. Fieberg noted that Chepilko had "experienced some improvement" since his last visit, although Dr. Fieberg's objective assessment, and the subjective complaints listed, remained virtually identical. (AR at 254-55.) On December 28, 2001, Dr. Fieberg noted "minor improvement" since Chepilko's previous visit. (AR at 256-257.) Dr. Fieberg then noted "some improvement" or "minor improvement" since each previous visit at each of six visits in January, 2002, four visits in February, 2002, three visits in March, 2002, one visit in April, 200, and two in May 2002. (AR at 258-289.) Dr. Freiberg's objective findings with respect to his examination of Chepilko did not change over the course of this time, and Chepilko's subjective complaints continued to assert that his level of pain was unchanged and continued to "seriously affect[] his daily activities." (See, e.g., AR at 288.) At no point did Dr. Feiberg specifically opine as to whether he believed Chepilko was disabled or otherwise unable to perform the material duties of his job.

Dr. Fieberg referred Chepilko for various tests during the course of his treatment. Dr. Fieberg referred Chepilko for electrodiagnostic testing by Doctor Gary Weiss, a neurologist. In December, 2001 and January, 2002, Chepilko underwent a Nerve Conduction Study and a Dermatomal Somatosensory Evoked Potential test, both of which use "electrodes . . . placed at various positions along the peripheral nerves." 229-230, 346-350. Dr. Weiss, a neurologist, interpreted the tests, and concluded that the test results for Chepilko's "lower extremity" were "consistent with . . . radiculopathy." (AR at 229, 346, 349.)[2] A spinal ultrasound was also taken in December, 2001, and evaluated by Dr. Wiess. (See AR at 351-352.) Dr. Weiss found that the ultrasound revealed "inflammation of a mild degree" with regard to one thoracic vertebra and one lumbar vertebra. (AR at 352.) Dr. Weiss noted that "[c]linical correlation is necessary." (AR at 352.) Dr. Weiss did not opine as to the extent of any disability suffered by Chepilko, and noted again

---

[2] Radiculopathy is "a pathologic process affecting the nerves at the root level. In descending order, it most commonly presents as pure sensory complaints, sensorimotor complaints, or pure motor complaints. This is due to the larger size of the sensory fibers rendering them more prone to injury." See Bookshelf: Radiculopathy - Definition, U.S. National Library of Medicine, National Institute of Health, http://www.ncbi.nlm.nih.gov/books/NBK27309 (excerpting S. Cuccurullo, ed., Physical Medicine and Rehabilitation Board Review (2004)).

after the last test in January, 2002 that "[c]linical correlation is recommended." (AR at 229.)

In early February, 2002, separate MRIs were taken of Chepilko's foot and lower back (lumbar spine). (See AR at 204-205.) The doctors who interpreted the MRIs opined that they were consistent with plantar fasciitis with respect to Chepilko's foot, and transitional vertebra and a degenerative disc bulge with respect to Chepilko's back. (AR at 204-205.) Neither opined as to the extent of any disability that may have been caused by these diagnoses. Dr. Fieberg also referred Chepilko for an MRI of his middle back (thoracic spine), and the radiologist who interpreted that MRI in March, 2002, detected "[n]o significant abnormalities." (AR at 343.)

In January, 2002, Chepilko also began seeing Dr. Igor Ostrovsky, a pain specialist. (Def's R. 56.1 Stmt ¶ 25; Pl.'s R. 56.1 Resp. ¶ 25.) Dr. Ostrovsky diagnosed Chepilko with lumbar radiculopathy due to a bulging disc, myalgia, muscle spasm, and plantar fasciitis, and noted his "impression that radiculopathy is the main sauce [sic] of the pain." (AR at 307-308.) Dr. Ostrovsky noted that Chepilko appeared to be in "severe pain," but he did not opine as to whether he was totally disabled or otherwise unable to perform the material duties of his job. (AR at 307-308.) Dr. Ostrovsky prescribed physical therapy three times a week, Vioxx, and paravertebral blocks

11

"[t]o control severe pain." (AR at 308.) On January 31, 2002,
Chepilko saw Dr. Ostrovsky again and received an injection for
his back, which Dr. Ostrovsky noted provided "instant pain
relief." (AR at 302.) Chepilko saw Dr. Ostrovsky again on
February 7, 2002, and March 21, 2002, and Dr. Ostrovsky's
assessment at both evaluations was virtually identical to his
initial evaluation from January 21, 2002. (AR at 303-306.)

Chepilko also had an initial evaluation at the Metropolitan
Pain Center in Manhattan on March 14, 2002. The initial
evaluation stated that Chepilko suffered from mid-back and lower
back pain that was aggravated by prolonged sitting and prolonged
walking. (AR at 203.) At the initial visit, Chepilko was
prescribed continued therapy and therapeutic exercise. (AR at
202.) The evaluation noted that Chepilko was "on disability
now," but did not state whether Chepilko was unable to perform
the material duties of his job. (AR at 202-203.) There is
evidence in the record of further visits to the pain center
through November of 2002 for lower back pain. (See AR at 185-
202.)

In September, 2002, Chepilko also sought the services of
the Medical Massage Group, located at the same address as the
Pain Center, for lower back pain. (See AR at 206.) In October,
2002, Chepilko had another evaluation with the Pain Center,
again indicating consistent lower back pain that was aggravated

12

by sitting or standing for more than 20 minutes or walking for
more than 20-25 minutes.  (AR at 197.)  Additional therapy was
prescribed, and Chepilko reported some improvement in the pain
in later sessions. (See AR at 185-188, 190-195.)

### D.

Chepilko filed a claim for long term disability benefits
with CLICNY on March 26, 2002. (Def.'s R. 56.1 Stmt ¶ 21; Pl.'s
R. 56.1 Resp. ¶ 21; see also AR at 442.)  Chepilko claimed
"severe pain in the low [sic] back and left foot, [and]
periodically strong headache" due to his experience walking back
to Brooklyn on September 11, 2001.  (AR at 442.)  He claimed he
became totally disabled on September 27, 2001.  (AR at 442.)[3]

Chepilko submitted with his claim form a Physician's
Statement of Disability filled out and signed by Dr. Ostrovsky.
Dr. Ostrovsky indicated on the form that Chepilko had a
herniated lumbar disc, plantar fasciitis, and mylagia.  (See AR
at 446.)  Dr. Ostrovsky indicated that Chepilko's disability was
"total," that Chepilko had been unable to do his job or any job

_____

[3] Chepilko also claimed that he was not receiving any form of
disability income.  (AR at 442.)  However, WMC's benefits
specialist indicated in an April 2, 2002 letter to CLICNY that
WMC "paid [Chepilko] the NYS disability benefits" for the period
"from September 28, 2001 to present," and WMC indicated on the
employer portion of the claim form that Chepilko had received
state disability benefits from October, 2001 through March,
2002.  (AR at 429, 444.)

since September 26, 2001, and that Chepilko's present job could not be "modified to allow for handling with impairment." (AR at 448.)

On April 16, 2002, Chepilko completed a Disability Proof of Loss form. He stated on the form that he was suffering from "severe pain in low [sic] back and left foot, periodically strong headaches." (AR at 331-32.) He indicated that his condition was an "illness" and not an "injury," and that his "[d]ate of illness" was September 11, 2001. (AR at 331.) Chepilko indicated on the form that his last day worked was September 26, 2001, on which day he claimed he worked zero hours, and he indicated that the date on which he was first unable to work was September 12, 2001. (AR at 331.) Chepilko also indicated that he was not laid off or terminated. (AR at 332.)

On April 22, 2002, Chepilko filled out an "Activities of Daily Living" Questionnaire as part of his application for benefits. (Def.'s R. 56.1 Stmt. ¶ 26; Pl.'s R. 56.1 Resp. ¶ 26; see also AR at 324-328.) Chepilko explained that he could not work because of "severe pain in the left foot and lower back area radiating to the right foot, aggravating [sic] during standing and walking." (AR at 324.) Chepilko listed Drs. Fieberg and Ostrovsky as his doctors, and noted that he was

14

taking Vioxx and Norvasc, and was doing physical therapy "1-2 times per week." (AR at 327.)

### E.

On June 7, 2002, CLICNY denied Chepilko's claim for Long-Term Disability benefits under the Policy. (AR at 292-93.) CLICNY explained in a letter to Chepilko that it was denying benefits because there was no evidence that Chepilko had been disabled for the entire 180 day waiting period beginning on September 27, 2001. (See AR at 294; see also AR at 320.) CLICNY wrote that it had only received treatment information from Dr. Ostrovsky, who had begun treating Chepilko in January, 2002, and that it had requested, but not received, Dr. Fieberg's records, or any other records from the period before January, 2002. (AR at 294.) CLICNY's denial of benefits letter explained that Chepilko had the right to appeal. (See AR at 295.)

CLICNY received Dr. Fieberg's notes shortly after the initial denial of benefits, and, in a conversation with Chepilko on June 10, 2002, the case manager for Chepilko's case explained to Chepilko that CLICNY could not simply change its determination and that he would need to appeal the denial. (See AR at 338-339; see also AR at 342.) Chepilko appealed the

denial of his claim in early December, 2002.  (AR at 162, 164-65.)

In January, 2003, CLICNY classified Chepilko's occupation as a "light" duty occupation.  (AR at 147.)  CLICNY determined that the job description in their database that most closely matched Chepilko's job description was "biochemist," a light duty occupation.  (See AR at 147-51.)[4]

As part of the appeal process, CLICNY sent Chepilko's file for an independent physician review.  (See AR at 125, 146)  Chepilko's medical file was reviewed by a neurologist, Dr. Kenneth Graulich.  Dr. Graulich wrote in his subsequent report that he attempted to contact Dr. Weiss, the neurologist who had conducted testing on Chepilko, without success, and that Drs. Feiberg and Ostrovsky would not speak to him until he produced a waiver from Chepilko, and did not return his calls after he procured a waiver.  (See AR at 129)  Dr. Graulich concluded that he thought Chepilko had "degenerative arthritis" of the spine, and a "history of plantar fasciitis."  (AR at 129.)  Dr. Graulich concluded that "[t]he medical documentation does not support the patient's inability to work at a light duty position

---

[4] Chepilko now contests that determination, arguing that he was required to "move heavy lab equipment."  (Pl.'s R. 56.1 Resp. ¶¶ 7, 54.)  The only evidence in the record to support the claim that Chepilko was required to move heavy lab equipment comes from Chepilko's previous assertions to that effect.  (AR at 165.)

from 9/27/01 and up to the present time," that there was "no evidence for radiculopathy," and that "[t]here is a strong suspicion that work problems may be playing a large part in the magnitude of his back pain complaints."  (AR at 129-130.)

CLICNY denied Chepilko's appeal in February, 2003.  (AR at 131-32.)  In a letter to Chepilko dated February 12, 2003, CLICNY explained that it was affirming the denial of benefits, largely based on Dr. Graulich's conclusion that "there is no medical evidence in your file to support your inability to work at any type of work."  (AR at 131; see also AR at 134.)  The letter further reminded Chepilko of his right to bring "legal action for benefits under ERISA."  (AR at 132.)

Chepilko filed this lawsuit on March 26, 2008.


                              **III.**

CLICNY argues that this action is barred by the statute of limitations contained within the Policy.

The Policy provides that "[n]o action at law or equity will be brought to recover on the policy until at least 60 days after proof of loss has been filed with the Insurance Company.  No action will be brought at all unless brought within 3 years (Kansas: 5 years; South Carolina: 6 years), after the time within which proof of loss is required by the policy."  (AR at 61.)  Chepilko's claim file indicates that the "Proof of Loss

                                 17

Date" for his claim was June 4, 2002.  (AR at 3.).[5]  Chepilko

brought this lawsuit on March 26, 2008.  (Def.'s R. 56.1 Stmt.

¶50; Pl.'s R. 56.1 Stmt ¶ 50.)

Chepilko argues that the statute of limitations for a

breach of contract action in New York is six years.  (See Pl.'s

R. 56.1 Resp. ¶¶ 20, 86;) see also N.Y. C.P.L.R. § 213.  If this

six year statute of limitations applied,[6] Chepilko's lawsuit

would be timely.  The issues are whether the language in the

Policy imposes a three year statute of limitations—in which case

Chepilko's action would plainly be time-barred—and whether such

a limitations period is enforceable.

Chepilko argues that the "legal actions provision is

vague," with "no specifications for other states, including New

York." (Pl.'s R. 56.1 Resp. ¶ 86.)  CLICNY argues that the

---

[5] Chepilko does not contest that June 4, 2002 is the date by
which proof of loss was required for the purpose of the
limitations period provided by the Policy, although he does
contest the enforceability of the limitations period itself.  It
is not clear from the record why June 4, 2002 is the appropriate
proof of loss date.  The Policy provides that written proof of
loss must be submitted "within 90 days after the date of the
loss for which a claim is made," but proof of loss may be
submitted later upon a showing that it was submitted "as soon as
was reasonably possible." (AR at 61.)  Because, as explained
above, CLICNY had received all of the medical documents in the
current record by June 10, 2002 at the latest, and because a
later proof of loss date would not affect the result in this
case, it is not necessary to consider whether June 4, 2002 is
the appropriate proof of loss date under the Policy.

[6] There is no argument that, if not for the shorter time period
specified in the Policy, the six year New York statute would
apply.

meaning of the provision is plain and unambiguous.   CLICNY is correct.

Courts in this Circuit construe the terms in ERISA plans in accordance with federal common law, and give the terms of the Plan their plain meanings.   Fay v. Oxford Health Plan, 287 F.3d 96, 104 (2d Cir. 2002).   "Where the contract language is plain and unambiguous, a court may construe the contract and grant summary judgment."   Id. (quoting Brass v. Am. Film Techs., Inc., 987 F.2d 142, 148 (2d Cir. 1993) (alteration omitted).   "Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire agreement."   Id. (alterations and internal quotation marks omitted).

In this case, a reasonably intelligent person could come to only one conclusion as to the meaning of the disputed term in the policy: legal actions must be filed within three years of the date on which proof of loss is required under the Policy, but there are exceptions to this rule in Kansas, where the period is five years, and South Carolina, where the period is six years.   Moreover, federal courts interpreting ERISA-covered plans employ the "familiar rules of contract interpretation."   Lifson v. INA Life Ins. Co. of N.Y., 333 F.3d 349, 352–53 (2d Cir. 2003) (per curiam).   One of those rules is "the textual canon of expressio unius est exclusio alterius."   See Novella v.

19

Westchester Cty., 661 F.3d 128, 142 (2d Cir. 2011) (applying

expressio canon in ERISA context).  Here, the Policy language

states a limitations period of three years, and provides for two

different periods for Kansas and South Carolina.  The natural

reading is that there is no different period for New York,

because such a New York exception was not expressed, and was

thus excluded.  In New York, suits under the Policy are

therefore subject to a three year limitations period.

Chepilko's claim was therefore brought well outside of the

period defined by the Policy.

The next issue is whether the limitations period in the

Policy is enforceable.  The Court of Appeals for the Second

Circuit has explicitly addressed this point, and held that such

limitations periods are enforceable.  Burke v.

PriceWaterHouseCoopers LLP Long Term Disability Plan, 572 F.3d

76, 81 (2d Cir. 2009) ("[A] court must not rewrite, under the

guise of interpretation, a term of the contract when the term is

clear and unambiguous, as is the policy-prescribed limitations

period at issue here." (internal quotation marks and citation

omitted)) (affirming grant of summary judgment based on three

year statute of limitations imposed by policy which began to run

on the Proof of Loss date); see also, e.g., Viti v. Guardian

Life Ins. Co. of America, 817 F. Supp. 2d 214, 224 (S.D.N.Y.

2011).  Moreover, Chepilko had "ample time within which to bring

[his] claim." Burke, 572 F.3d at 81.  Chepilko offers no
argument or explanation for why he was unable to file his claim
at any time before June, 2005.

Because the limitations period prescribed by the Policy in
this case is enforceable, and because Chepilko's claim was filed
over two years after that period had run, Chepilko's claim is
barred.  The defendant's motion for summary judgment is
therefore **granted**.[7]

### CONCLUSION

The Court has considered all of the arguments raised by the
parties. To the extent not specifically addressed, the arguments
are either moot or without merit.

The defendant's motion for summary judgment is **granted.**

**The Clerk is directed to enter judgment, to close this case
and to close all pending motions.**

SO ORDERED.

Dated:      New York, New York
            June 26, 2012

                                    John G. Koeltl
                            United States District Judge

---

[7] Because summary judgment is proper with respect to the Policy's
statute of limitations, it is unnecessary to reach the question
of whether Chepilko was disabled for the requisite 180-day
period.